IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| TIONI KING, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | FILE NO.: 3:09-cv-27 (CDL) |
| | : | |
| ANGEL FOOD MINISTRIES, INC.; | : | |
| ANGEL FOOD MINISTRIES- | : | |
| ATHENS, INC; | : | |
| GOOD HOPE FOODS, INC.; | : | JURY TRIAL DEMANDED |
| GOOD HOPE FOOD COMPANY, | : | |
| INC.; EMMANUEL PRAISE | : | |
| MINISTRIES; EMMANUEL PRAISE | : | |
| CHURCH, INC.; GOOD HOPE | : | |
| TRANSPORTATION, INC.; | : | |
| ANDREW WINGO; WESLEY JOSEPH | : | |
| ("JOE") WINGO; LINDA WINGO; | : | |
| JONATHON WESLEY WINGO | : | |
| | : | |
| Defendants, | : | |
| _____ | : | |

## COMPLAINT

Plaintiff Tioni King ("Plaintiff" or "King") submits the following Complaint

against Defendants Angel Food Ministries, Inc.; Angel Food Ministries-Athens,

Inc.; Good Hope Foods, Inc.; Good Hope Food Company, Inc.; Emmanuel Praise

Ministries; Emmanuel Praise Church, Inc.; Good Hope Transportation, Inc.

(collectively, the "Angel Food Ministries Defendants" or "AFM Defendants");

Andrew Wingo; Wesley Joseph ("Joe") Wingo; Linda Wingo; and Jonathon Wesley Wingo (collectively, the "Wingo Defendants").[1]

1.

This is an action arising from all Defendants' sexual harassment and retaliatory termination of King in violation of Title VII of the Civil Rights Act of 1964, as amended.  King also brings claims under Georgia law for false imprisonment, assault and battery, intentional infliction of emotional distress, and negligent hiring, supervision, and retention.  King seeks injunctive relief and compensatory and punitive damages against all Defendants.

<b><u>JURISDICTION AND VENUE</u></b>

2.

King's Title VII claims present federal questions over which the Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. §2000e-5(f)(3).

3.

The Court has supplemental jurisdiction over King's State law claims under 28 U.S.C. § 1367.

---

[1] During the events described in this Complaint, Plaintiff King was known as Tioni Barish.  She subsequently married and changed her last name to King.

4.

This Court is an appropriate venue for all of King's claims under 28 U.S.C. § 1391(b) and 42 U.S.C. §2000e-5(f)(3), because all of the parties reside within the Middle District of Georgia, and the substantial majority of events giving rise to King's claims occurred in this judicial district.

5.

Plaintiff filed a timely charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a notice of her right to sue from the EEOC within the last 90 days and has complied with all other conditions precedent to the institution of this lawsuit.

## **PARTIES**

6.

King resides in the Middle District of Georgia. She was employed by the AFM Defendants at all times material to this Complaint, until her retaliatory termination on October 19, 2007.

7.

Defendant Angel Food Ministries, Inc. is a non-profit corporation with its principle offices and place of business in Good Hope, Georgia. This Defendant is licensed to do business in Georgia. Defendant Angel Food Ministries, Inc. is

subject to the jurisdiction of this Court and may be served with process upon its registered agent, Wesley Joseph Wingo, at 1620 South Broad Street, Monroe, Georgia 30655.

8.

Defendant Angel Food Ministries-Athens, Inc. is a non-profit corporation with its principle offices and place of business in Good Hope, Georgia. This Defendant is licensed to do business in Georgia. Defendant Angel Food Ministries-Athens, Inc. is subject to the jurisdiction of this Court and may be served with process upon its registered agent, Michael Berger, at One Huntington Road, Suite 106, Athens, Georgia 30606.

9.

Defendant Good Hope Foods, Inc. is a for-profit corporation with its principle offices and place of business in Monroe, Georgia. This Defendant is licensed to do business in Georgia. Defendant Good Hope Foods, Inc. is subject to the jurisdiction of this Court and may be served with process upon its registered agent, Sherri Monger, at 128 Crestmont Drive, Canton, Georgia 30114.

10.

Defendant Good Hope Food Company, Inc. is a for-profit corporation with its principle offices and place of business in Good Hope, Georgia. This Defendant

is licensed to do business in Georgia.  Defendant Good Hope Food Company, Inc. is subject to the jurisdiction of this Court and may be served with process upon its registered agent, Defendant Andrew Wingo, at 3051 Nunnally Shoals Road, Good Hope, Georgia 30641.

11.

Defendant Emmanuel Praise Ministries is an unincorporated entity with the capacity to sue and be sued, and with its principle offices and place of business in Monroe, Georgia.  This Defendant is subject to the jurisdiction of this Court and may be served with process upon its officer, Wesley Joseph Wingo, at 3051 Nunnally Shoals Road, Good Hope, Georgia 30641.

12.

Defendant Emmanuel Praise Church, Inc. is a non-profit corporation with its principle offices and place of business in Monroe, Georgia. This Defendant is licensed to do business in Georgia.  Defendant Emmanuel Praise Church, Inc. is subject to the jurisdiction of this Court and may be served with process upon its registered agent, Wesley Joseph Wingo, at 1557 South Broad Street, Monroe, Georgia 30655.

13.

Defendant Good Hope Transportation, Inc. is a for-profit corporation with its principle offices and place of business in Monroe, Georgia.  This Defendant is licensed to do business in Georgia.  Defendant Good Hope Transportation, Inc. is subject to the jurisdiction of this Court and may be served with process upon its registered agent, Michael L. Berger, at One Huntington Road, No. 106, Athens, Georgia 30606.

14.

Defendant Andrew Wingo is a resident of Georgia and is subject to the jurisdiction of this Court.  Defendant Andrew Wingo may be served with process at his business address, 3051 Nunnally Shoals Road, Good Hope, Georgia 30641. Defendant Andrew Wingo is the son of Defendants Wesley Joseph ("Joe") Wingo and Linda Wingo, and the brother of Defendant Jonathon Wesley Wingo.

15.

Defendant Wesley Joseph ("Joe") Wingo is a resident of Georgia and is subject to the jurisdiction of this Court.  Defendant Wesley Joseph Wingo may be served with process at 1620 South Broad Street, Monroe, Georgia 30655. Defendant Wesley Joseph Wingo was, at all times material to this Complaint, married to Defendant Linda Wingo.

16.

Defendant Linda Wingo is a resident of Georgia and is subject to the jurisdiction of this Court.  Defendant Linda Wingo may be served with process at 1620 South Broad Street, Monroe, Georgia 30655.  Defendant Linda Wingo was, at all times material to this Complaint, married to Defendant Wesley Joseph Wingo.

17.

Defendant Jonathon Wesley Wingo is a resident of Georgia and is subject to the jurisdiction of this Court.  Defendant Linda Wingo may be served with process at 1620 South Broad Street, Monroe, Georgia 30655.  Defendant Jonathon Wesley Wingo is the son of Defendants Wesley Joseph ("Joe") Wingo and Linda Wingo, and the brother of Defendant Andrew Wingo.

## FACTUAL ALLEGATIONS

18.

At all times material to the Complaint, the AFM Defendants were substantially or wholly owned, operated, and/or controlled by the Wingo Defendants.  The Wingo Defendants, individually and/or collectively, had substantial managerial control and/or ownership of the AFM Defendants, both individually and collectively, at all times material to this Complaint.

19.

Upon information and belief, at all times material to this action, the assets, capital, employees, management, officers, and operations of the AFM Defendants were substantially comingled, such that no clearly recognizable divisions exist between the AFM Defendants, and the individual AFM Defendants lacked personalities separate from each other.

20.

Upon information and belief, at all times material to this action, the Wingo Defendants' personal assets and capital were substantially comingled with one or more of the Emmanual Praise Defendants such that no clearly recognizable division exists between the Wingo Defendants and the AFM Defendants.  Upon information and belief, some or all of the AFM Defendants, either individually or collectively, are the alter egos of the Wingo Defendants and serve as vehicles by which these Defendants transact their personal affairs.

21.

Upon information and belief, some or all of the AFM Defendants were created and maintained, at least in part, for the purpose of shielding other AFM Defendants and the Wingo Defendants from liability in civil actions such as this

lawsuit.  This creation and maintenance of the AFM Defendants was undertaken in bad faith and constitutes an abusive use of the corporate form.

22.

At all times material to this Complaint, Defendant Angel Food Ministries, Inc. had outstanding, unsecured loans to each of the Wingo Defendants in the following amounts: $586,791 to Defendant Wesley Joseph ("Joe") Wingo; $385,436 to Defendant Linda Wingo; $188,332 to Defendant Andrew Wingo; and $276,272 to Defendant Jonathon Wesley Wingo.

23.

At all times material to this Complaint, Defendant Andrew Wingo had, at least, the following controlling roles in the AFM Defendants: (a) Chief Operating Officer ("COO") of Defendant Angel Food Ministries, Inc.; (b) Director, Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and Secretary of Defendant Good Hope Food Company, Inc.; and (c) Director, CFO, and assistant Pastor of Defendant Emmanuel Praise Church, Inc.

24.

At all times material to this Complaint, Defendant Wesley Joseph ("Joe") Wingo had, at least, the following controlling roles in the AFM Defendants: (a) CEO and Director of Defendant Angel Food Ministries, Inc.; (b) CEO of

Defendant Angel Food Ministries-Athens, Inc.; (c) Director of Defendant Good Hope Food Company, Inc.; (d) Director and Pastor of Defendant Emmanuel Praise Church, Inc.; and (e) CEO of Defendant Good Hope Transportation, Inc.

25.

At all times material to this Complaint, Defendant Linda Wingo had, at least, the following controlling roles in the AFM Defendants: (a) Secretary and Director of Defendant Angel Food Ministries, Inc.; (b) Director of Defendant Good Hope Food Company, Inc.; (c) Director, Pastor, and Secretary of Defendant Emmanuel Praise Church, Inc.; and (d) Secretary of Defendant Good Hope Transportation, Inc.

26.

At all times material to this Complaint, Defendant Jonathon Wesley Wingo had, at least, the following controlling and operational roles in the AFM Defendants: (a) President of Defendant Angel Food Ministries, Inc.; (b) Secretary of Defendant Angel Food Ministries-Athens, Inc.; (c) Director of Defendant Good Hope Food Company, Inc.; (d) Director and CEO of Defendant Emmanuel Praise Church, Inc.; (e) CFO of Defendant Good Hope Transportation, Inc.

27.

At all times material to this Complaint, all Defendants had control over King's employment and the terms and conditions thereof.

28.

At all times material to this Complaint, some or all of the AFM Defendants strictly required all of their employees to be members of the Emmanuel Praise Ministries/ Emmanuel Praise Church, Inc. congregation and attend regular worship at the Emmanuel Praise Church.

29.

King began her employment with the AFM Defendants in December 2005, when Defendant Andrew Wingo offered King a job as in-house caterer for Defendant Angel Food Ministries, Inc., which King accepted.

30.

For approximately the first year of her employment, King had little contact with Defendant Andrew Wingo, even though he was nominally her direct supervisor.

31.

During the first year of her employment, King worked with little to no supervision from Defendant Andrew Wingo or anyone else.  She had no significant problems at work, and received no discipline of any kind.

32.

On January 16, 2007, King approached Defendant Andrew Wingo in his capacity as Defendant Emmanual Praise Ministries' assistant pastor, one of his several roles within the AFM Defendants.  King confided in Defendant Andrew Wingo that she intended to seek a divorce from her then-husband, James Lee, and asked for Defendant Andrew Wingo's spiritual counsel.  Lee was also employed by Defendant Angel Food Ministries.

33.

Shortly after this meeting, King informed Lee that she wished to get divorced.

34.

Lee spoke about the divorce to Defendant Andrew Wingo.  Defendant Andrew Wingo, with no factual basis whatsoever, told Lee that King had had an extra-marital affair.  Defendant Andrew Wingo knowingly and maliciously made this false statement in order to injure King.

35.

When King learned of Defendant Andrew Wingo's malicious false statement to Lee, King confronted Wingo in person and told him that she had never had an affair.

36.

Due to the financial hardships of her divorce, King approached Defendant Andrew Wingo to request a raise.  Sensing the opportunity to place himself in a greater position of power over King, Defendant Andrew Wingo stated that if he gave her a raise, the other Wingo Defendants would only demand more of her time and energy as an employee.  Instead, he stated he would give King occasional cash bonuses at his discretion.

37.

Throughout early 2007, Defendant Andrew Wingo insinuated himself more directly into King's affairs.  He spent more and more time in the kitchen while King was working, even though he had no work-related reason to be there and had never previously spent significant time in the kitchen.

38.

Defendant Andrew Wingo repeatedly made unwanted, sexually lewd comments to King.  On one occasion, Defendant Andrew Wingo joked that his

wife was angry because Wingo had slept with one of King's former coworkers. On another occasion, Defendant Andrew Wingo bragged that his wife would give him whatever he wanted, because he "kept her smiling."   Defendant Andrew Wingo stated, "What Andy wants, Andy gets."

39.

In early April 2007, Defendant Andrew Wingo offered King a position as a secretary with Defendant Good Hope Foods, Inc. and Defendant Good Hope Food Company, Inc., in addition to her position as caterer for Defendant Angel Foods Ministries, Inc.  Defendant Andrew Wingo promised King a $35,000 annual salary for the secretary position, and King, reasonably and materially relying on this salary offer, accepted.

40.

Defendant Andrew Wingo immediately tried to take advantage of King's known reliance on the additional income.  In March or April 2007, he tried to persuade her to travel with him to Denver, Colorado to inspect a food processing plant on behalf of Defendants Good Hope Foods, Inc. and Good Hope Food Company, Inc.

41.

King declined, but Defendant Andrew Wingo did not relent.  He called her at home and pressured her to come with him.  When King tried to politely refuse by saying she did not have any clothes nice enough for the trip, Wingo told her that all she "needed was a string bikini."  He insisted that she meet him at the Monroe, Georgia airport.  King felt extremely uncomfortable and distressed by the situation, and she did not go to the airport.

42.

At work shortly after this incident, Defendant Andrew Wingo and his assistant, Harry Michaels, came into the kitchen and mocked King, saying they had waited for her for four hours at the airport.  Wingo told her that since he never got to see her in a string bikini, he at least deserved a photograph of her in one.  King told Wingo she was not interested in him.

43.

Not long after King rejected Defendant Andrew Wingo's solicitation for a bikini photograph, Wingo cornered King in an office.  It was apparent to King that Defendant Andrew Wingo wanted her sexually.  King explicitly told Wingo that she was not interested, that his advances were inappropriate, and that nothing would ever happen between them.

44.

In May 2007, Defendant Andrew Wingo again solicited King to travel with him on business, this time to Chicago, to attend the National Restaurant Association convention.   King reluctantly accepted, on condition that her coworker, Marianne Csanadi, accompany her.

45.

On the first night of the trip, King learned that Defendant Andrew Wingo had secretly made sleeping arrangements designed to facilitate his further sexual harassment of her.  Defendant Andrew Wingo had reserved only one hotel suite. At Wingo's direction, his assistant, Michaels, would share one part of the hotel suite with a prostitute, while Defendant Andrew Wingo, Csanadi, and King would all share the other room.

46.

Defendant Andrew Wingo insisted that he and King sleep in the same bed.

47.

In an unfamiliar city, with no other options, and fearing for her job, King slept, fully clothed, in Defendant Andrew Wingo's bed.  He placed his hands on her and tried to kiss her, but she rejected him.

48.

On the second night of the trip, Defendant Andrew Wingo again forced King to sleep in his hotel bed with him.  As King lay trapped, Wingo told her that, if she would not have sex with him, "a blowjob would be just as good."  He stated that there were many women who would love to give him a blowjob, including his cousin's wife, April, whom he claimed wanted him sexually.  Again, King, though trapped and fearing for her job, rejected him.

49.

Throughout the Chicago trip, Defendant Andrew Wingo gave King and Csanadi approximately $10,000 in cash and insisted that they carry it with them and use it to pay for everything on the group's behalf.  At Defendant Andrew Wingo's instruction, King brought the remaining cash back to Atlanta with her in a bank bag.

50.

On the night that the group returned to Atlanta, Defendant Andrew Wingo called King and asked her to meet him at Defendant Angel Foods Ministries, Inc.'s facility, because he had left his "medication" in the bank bag with the cash he had given to King to take home with her.  Wingo claimed he needed the medication

immediately because he was suffering from a fatal disease, so King brought him the medication, which she located in the bank bag.

51.

When King approached Defendant Andrew Wingo to give him the medication, Wingo tried to kiss her. She refused, and Wingo angrily sped away in his car. Later the same night, Defendant Andrew Wingo sent King a series of cellular phone text messages. He moped that he was "[g]oing to bed" and "not doing so hot again." He directed King to keep the cash from the Chicago trip and put a new car on the company credit card.

52.

When King sent a text message the following day expressing concern for Defendant Andrew Wingo's health, Wingo responded with a text message of his own: "Can I call you? This what [*sic*] I was sending good night soft delicate kisses while tweeking [*sic*] your sweet little hiney while you…."

53.

The next day, Defendant Andrew Wingo sent King a digital photograph of himself via text message. In the photo, Wingo was standing bare-chested, wearing a Crucifix, in front of a mirror.

54.

In June 2007, not long after King had repeatedly rejected his sexual advances on the Chicago trip, Defendant Andrew Wingo reneged on the agreement that King would be paid a $35,000 annual salary for her employment as a secretary with Defendants Good Hope Foods, Inc. and Good Hope Food Co., Inc. Apparently as a partial consolation, Wingo purchased $3,550 of furniture for King.

55.

As time progressed, Defendant Andrew Wingo's harassment – and its *quid pro* quo nature -- became increasingly apparent, direct, and disturbing. Because King continued to reject his frequent advances, Wingo crudely reminded her that he paid her babysitter's salary, that he paid her mother's salary, that he paid Ms. Csanadi's salary, and that he paid her ex-husband, Mr. Lee's, salary.

56.

On one occasion, while King worked in the kitchen wearing a tank top, Defendant Andrew Wingo snuck up behind her, poured honey on her shoulder, and tried to lick it off.  King, horrified, immediately told him to stop.

57.

On several occasions, Defendant Andrew Wingo sent King text messages containing photographs of himself.  In nearly all of these photographs, Wingo wore

no shirt, or wore only underwear.   In several of the photographs, he was completely nude.  Defendant Andrew Wingo even sent King a close-up photograph of his penis.

58.

Defendant Andrew Wingo's assistant, Michaels, joined in his efforts, calling King to tell her that Wingo had done a lot for her and that she ought to show her appreciation.  Michaels plainly meant that King should express her appreciation to Defendant Andrew Wingo through sexual favors.

59.

The severe and pervasive sexual harassment took a significant toll on King. She suffered constant stress.  She began having anxiety attacks.  On one occasion, King arrived at work crying and told Defendant Andrew Wingo that her health was suffering because of his unwanted sexual advances and that she could not take his treatment of her anymore.

60.

When King called Defendant Andrew Wingo to say she was too sick to come to work, Defendant Wingo threatened to fire one of King's kitchen staff in reprisal.

61.

In late June or early July 2007, Defendant Andrew Wingo ordered King to accompany him on another supposed business trip, this time to New York and Atlantic City, New Jersey.  He ordered King to bring the remaining Chicago cash with her, even though he had previously told her it was hers to keep.  Defendant Andrew Wingo arranged for Csanadi to bring her husband on the trip and for Michaels to bring his prostitute so that Wingo would be the only "single" male on the trip and would therefore have a pretext for spending time with King.

62.

After her experience in Chicago, King had no intention of going, but she knew that Defendant Andrew Wingo would punish her (or someone about whom she cared) if she refused.  She skipped the flight to New York, claiming she was sick.  Defendant Andrew Wingo scheduled her on a flight to Atlantic City.  Again, King missed the flight, claiming illness.  Defendant Andrew Wingo ordered her a third flight, which she again missed.

63.

Defendant Andrew Wingo, obsessive, scheduled a fourth flight.  He called King and told her, "get on the plane or you will not have a job."

64.

Then, on Defendant Andrew Wingo's orders, John Kraft, the AFM Defendants' head of security, appeared at King's home and directed her to get in his car and go with him to the airport.  King knew that Kraft, like the other security guards permanently employed by the AFM Defendants, was armed.  She went with him and got on the plane because of the obvious threats to her safety and her job.

65.

When King arrived in New York, she saw that Defendant Andrew Wingo had again arranged for them to share a bed. Again, she slept, fully clothed, on the edge of the bed.

66.

The next morning, Defendant Andrew Wingo tried to persuade King to shower or take a bath with him.  She refused.  During the remaining days of the trip, Defendant Andrew Wingo continued his unwanted sexual advances and comments, and King continued to refuse him.

67.

On the flight home, King again told Defendant Andrew Wingo that she could not tolerate his behavior any longer, that it was substantially affecting her

health, and that he had to stop.  Two days after they returned from New York, King

returned the bag containing the Chicago-trip cash to Defendant Andrew Wingo.

68.

Seeing no alternatives and no end in sight, Ms. King retained an attorney,

Donald W. Osborne.

69.

On September 24, 2007, Osborne wrote a letter notifying the AFM

Defendants of King's claims, including her sexual harassment claims, and setting

forth a settlement demand.

70.

On October 8, Pastor Johnny Willis, an employee of the AFM Defendants,

held a meeting in which he claimed he was taking over Defendant Wingo's

position as COO of Defendant Angel Food Ministries, Inc.

71.

Willis immediately began to closely scrutinize King.  This was a substantial

and material change to King's working conditions as, under Defendant Andrew

Wingo's supervision, King had enjoyed a high degree of autonomy in terms of her

day-to-day job performance.

72.

Less than three weeks after the AFM Defendants received Osborne's demand letter, Kathy Glass, an employee of the AFM Defendants, called King on her cell phone while she was working from home.

73.

King did not receive the call so Ms. Glass left her a voice message ordering her to report to work within one hour, and to bring with her two cell phones and two laptops that Defendant Andrew Wingo had given her.  Ms. Glass also sent King an e-mail with the same arbitrary demand to an e-mail address that Ms. King never used.

74.

King did not receive the voice message and never received the e-mail (though a copy of the e-mail was mailed to her through the U.S postal service) until well after the arbitrary deadline had expired.  The Defendants made no other effort to contact King, even though they knew she was working from home with their permission.

75.

On October 19, 2007, the Defendants terminated King's employment.  The claimed reason was, "[v]iolation of company policy which include [sic] job abandonment and insubordination."

76.

The Defendants' purported reasons for termination are a pretext for retaliation.  Defendants terminated King because she engaged in conduct protected by Title VII of the Civil Rights Act of 1964 in repeatedly refusing and opposing Defendant Andrew Wingo's sexual harassment and by retaining counsel to press her claims against the Defendants.

77.

All Defendants' above-described conduct was malicious, wanton, willful, oppressive and, alternatively, reckless toward King.  The Defendants undertook all of the unlawful conduct complained of herein with the specific intent to harm King.

78.

All Defendants, by and through their intimate personal, business, and legal relationships with Defendant Andrew Wingo and through other means, had actual

or constructive knowledge of Defendant Andrew Wingo's unlawful conduct toward King.

80.

79.

All Defendants knowingly and deliberately failed to take preventative or corrective measures against Defendant Andrew Wingo and otherwise failed to intercede to protect King from Defendant Andrew Wingo's unlawful conduct; instead, all Defendants terminated King in retaliation for her opposition to Defendant Andrew Wingo's conduct.

**COUNT I**
**SEXUAL HARASSMENT – TITLE VII**
**(The AFM Defendants)**

80.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

81.

All AFM Defendants are Plaintiff's employer or joint employers within the meaning of 42 U.S.C. § 2000e(b), and they should be treated as a single entity, with all of their employees aggregated, for purposes of applying Title VII and the interpretive case law to this action.

82.

Plaintiff was subjected to sexual harassment by Defendant Andrew Wingo, her immediate supervisor, for which all AFM Defendants are jointly and vicariously liable.  At all times relevant to this action, all Defendants knew or should have known of Defendant Andrew Wingo's sexual harassment of Plaintiff and the existence of a hostile work environment, but failed to take immediate remedial action to protect Plaintiff.  Instead, all Defendants allowed a sexually harassing work environment to exist.  Moreover, Defendants terminated Plaintiff for refusing Defendant Andrew Wingo's sexual advances and opposing his unlawful conduct.  The AFM Defendants' actions constitute unlawful intentional sex discrimination in violation of Title VII of the Civil Rights Act, as amended.

83.

The AFM Defendants willfully and wantonly disregarded Plaintiff's rights, and Defendants' discrimination against Plaintiff was undertaken in bad faith.

84.

As a result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

## COUNT II
## RETALIATION - TITLE VII
### (The AFM Defendants)

85.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

86.

All AFM Defendants are Plaintiff's employer or joint employers within the meaning of 42 U.S.C. § 2000e(b), and they should be treated as a single entity, with all of their employees aggregated, for purposes of applying Title VII and the interpretive case law to this action.

87.

The AFM Defendants' actions, in subjecting Plaintiff to retaliation for engaging in a protected activity by complaining of, and opposing, sexual harassment internally and through counsel, constitute unlawful intentional retaliation in violation of Title VII of the Civil Rights Act, as amended.

88.

Defendants willfully and wantonly disregarded Plaintiff's rights and Defendants' retaliation against Plaintiff was undertaken in bad faith.

89.

As a result of Defendants' unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

**COUNT III**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(All Defendants)**

90.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

91.

Defendant Andrew Wingo intentionally, maliciously, wantonly and in gross and reckless disregard for Plaintiff's health and safety, engaged in extreme and outrageous conduct when he subjected Plaintiff to embarrassment, humiliation, degradation and ridicule by harassing her in the presence of coworkers and by (in conjunction with the all other Defendants) firing her for rejecting his sexual advances and for retaining counsel to oppose his treatment of her, thereby causing Plaintiff to suffer grievous emotional distress, mental anguish, loss of income, humiliation, and other indignities.

92.

Based on their actual and constructive knowledge of Defendant Andrew Wingo's sexual harassment and retaliation, coupled with their failure to intercede on Plaintiff's behalf, all Defendants condoned, adopted, and ratified Defendant Andrew Wingo's conduct, making them liable for Defendant Andrew Wingo's intentional infliction of emotional distress of Plaintiff.

93.

All Defendants' refusal to discipline Defendant Andrew Wingo and/or terminate his employment, their refusal to take action to prevent the harassing and retaliatory actions against Plaintiff, and their own participation in the unlawful conduct toward Plaintiff, make the Defendants independently liable for their own intentional infliction of emotional distress of Plaintiff.

94.

As a result of all Defendants' unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

## COUNT IV
## NEGLIGENT SUPERVISION AND RETENTION
### (All Defendants)

95.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

96.

All Defendants continued Defendant Andrew Wingo's employment when they either did know, constructively knew, or in the exercise of reasonable care should have known, of Defendant Andrew Wingo's sexual harassment directed toward Plaintiff and/or that Wingo had a history of, or predilection to commit, such unlawful acts toward women.

97.

Notwithstanding the above, all Defendants negligently supervised Defendant Andrew Wingo, failed to intercede on Plaintiff's behalf, and negligently retained Wingo, thereby ratifying, condoning, and adopting his conduct, making them liable for the negligent supervision and retention of Defendant Andrew Wingo.

98.

As a result of all Defendants' unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

## COUNT V
## ASSAULT
**(All Defendants)**

99.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

100.

Defendant Andrew Wingo's conduct and actions alleged herein toward Plaintiff reasonably led her to anticipate that Wingo would engage in the unwanted touching of her, and in fact he did so touch her on many occasions, making Defendant Andrew Wingo liable to Plaintiff for assault.

101.

Based on their actual and constructive knowledge of Defendant Andrew Wingo's misconduct, coupled with their failure to intercede on Plaintiff's behalf, all Defendants condoned, adopted, and ratified Defendant Andrew Wingo's conduct, making them liable for Wingo's assault of Plaintiff.

102.

As a result of Defendants' unlawful actions, Plaintiff has suffered emotional

distress, inconvenience, loss of income, humiliation, and other indignities.

**COUNT IX**
**BATTERY**
**(All Defendants)**

103.

Plaintiff hereby incorporates each and every preceding paragraph as if set

forth fully herein.

104.

Defendant Andrew Wingo's conduct and actions alleged herein toward

Plaintiff amounted to the repeated unwanted and offensive touching of Plaintiff by

Wingo, making Defendant Andrew Wingo liable to Plaintiff for battery.

105.

Based on their actual and constructive knowledge of Defendant Wingo's

misconduct, coupled with their failure to intercede on Plaintiff's behalf, the all

Defendants condoned, adopted, and ratified Defendant Andrew Wingo's conduct,

making them liable for Wingo's battery of Plaintiff.

106.

As a result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, inconvenience, loss of income, humiliation, and other indignities.

**COUNT VII**
**FALSE IMPRISONMENT**
**(All Defendants)**

107.

Plaintiff incorporates each and every preceding paragraph as if set forth fully herein.

108.

All Defendants unlawfully detained Plaintiff against her will and deprived her of her liberty on multiple occasions, and their conduct on each occasion constitutes false imprisonment under O.C.G.A. § 51-7-20.                   .

109.

Based upon their actual and constructive knowledge of Defendant Andrew Wingo's conduct and of John Kraft's conduct, coupled with their failure to intercede on Plaintiff's behalf, all Defendants condoned, adopted and ratified Defendant Andrew Wingo's and Kraft's conduct, making them liable for Plaintiff's false imprisonment.

110.

As a direct and proximate result of these actions, Plaintiff suffered damages, including emotional distress, inconvenience, loss of income, humiliation and other indignities.

111.

As to all Counts asserted herein, all Defendants acted maliciously, willfully, wantonly, oppressively, or recklessly, toward King, authorizing a punitive damages award for all claims as to which punitive damages are available.

WHEREFORE, Plaintiff demands a TRIAL BY JURY and for the following relief:

(a)     a declaratory judgment that the AFM Defendants have engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act, as amended;

(b)     an injunction prohibiting the AFM Defendants from engaging in unlawful employment practices in violation of Title VII of the Civil Rights Act;

(c)     full back pay from the date of Plaintiff's termination, taking into account all raises to which Plaintiff would have been entitled but for

her unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d)     reinstatement to Plaintiff's former position with Defendants, or in the alternative, front pay to compensate Plaintiff for lost future wages, benefits, and pension;

(e)     compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(f)     punitive damages in an amount to be determined by the enlightened conscious of the jury to be sufficient to punish the Defendants for their conduct toward Plaintiff and deter them from similar conduct in the future;

(g)     reasonable attorneys' fees and costs; and

(i)     other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**


Respectfully submitted this 27th day of February, 2009.

BUCKLEY & KLEIN, LLP

s/ Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleyklein.com
Steven E. Wolfe
Georgia Bar No. 142441
sewolfe@buckleyklein.com

Atlantic Center Plaza, Suite 1100
1180 West Peachtree Street, NW
Atlanta, GA  30309
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101


ROSS & PINES LLC

s/ Devon Alexandra Atchison
Georgia Bar No. 574720
devonatchison@rossandpines.com

3340 Peachtree Road, NE
Tower Place 100
Suite 1530
Atlanta, GA  30326
Telephone: (404) 812-4300
Facsimile:  (404) 842-7710

Attorneys for Plaintiff